IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE SUBPOENA SERVED ON STEPHEN K. BANNON ) ) ) ) CLYDE & CO., 1775 PENNSYLVANIA ) AVENUE, NW, SUITE 400, WASHINGTON, ) DC 20006 ) | Case No. 19-mc-00209 |

**REPLY IN SUPPORT OF MOVANT'S MOTION TO COMPEL COMPLIANCE BY STEPHEN K. BANNON WITH FED. R. CIV. P. 45 SUBPOENA FOR TESTIMONY OR, ALTERNATIVELY, FOR FINDING OF CONTEMPT**

Stephen K. Bannon's many critiques of the Fed. R. Civ. P. 45 subpoena issued by Movant Strategic Vision US, LLC ("Movant") are untimely. The juncture when these sorts of arguments would have been cognizable in *this* District[1] is well-established—prior to the November 22, 2019 subpoena return date. *HT S.R.L. v. Velasco*, 125 F. Supp.3d 211, 220-21 (D. D.C. 2015). If Mr. Bannon wanted to avoid the judicial command-to-appear legally effected by the duly-issued, personally-served subpoena (on relevance grounds, burden grounds, or anything else), he needed to obtain relief under Rule 45(d)(3) prior to that date. It is of no moment that this would have required expedited action—expedited relief is available in this District, as shown December 28, 2019, when this Court granted Movant's December 27, 2019 motion for expedited briefing. At a minimum, Mr. Bannon could have sought an order staying the subpoena, even if full briefing was not done until later. He instead took no action in any court.

Whether or not by design, Mr. Bannon sought no relief of any type in the window allowed by this Court and Rule 45(d)(3) through November 22nd. Mr. Bannon offers no excuse for this—he cannot argue he was unaware of the subpoena (he was personally served with it), that he needed time to locate counsel (served on November 14th, he had counsel contact Movant

---

[1] Mr. Bannon cites unpublished decisions from Connecticut and California to argue the timeliness of his arguments (he still has never sought affirmative relief from the subpoena). (ECF 8, p. 15)

less than two business days later), or that his counsel was unavailable (his counsel spoke with Movant at least twice before the return date and exchanged emails, including one minutes before Movant's counsel was to board a plane for the deposition, confessing for the first time that Mr. Bannon did not intend to appear). Without a Court order excusing him, or even staying the subpoena until later, Mr. Bannon simply failed to appear on the return date. Now, five weeks later and only after forcing Movant to be the party to seek the relief, Mr. Bannon casts stones at Movant's diligence in discovery, manner of preparing its case for trial, and belief in the merits of its claims.[2]  His contentions should be summarily rejected as untimely and, as shown below, are unfounded. On timeliness grounds alone, *Velasco* guides what should happen—Mr. Bannon should be directed to appear on January 10, 2020, the deadline set by the issuing court for the deposition, 125 F. Supp.3d at 220-21.  It has been noticed with the knowledge of Mr. Bannon's counsel.

## PROCEDURAL HISTORY

Movant has experienced extreme procedural difficulty in obtaining this critical discovery from an individual named repeatedly in its Counterclaims as having direct knowledge of and involvement in relevant events and circumstances.[3] In the issuing court, this included the hurdle of serving Mr. Bannon, which required three separate process servers, more than $5,000 on numerous service attempts beginning September 25, 2019, the issuance of three different subpoenas, and extensive legal briefing to obtain leave of court to conduct the deposition after

---

[2]    Mr. Bannon variously criticizes Movant's case as involving "sweeping third-party discovery," "a fishing expedition," and "a highly speculative fraudulent misrepresentation counterclaim." (ECF 8, p. 1) All indicate Mr. Bannon's implicit request that this Court accept his view of the procedural history, discovery background, and merits of the case. For those reasons, Movant has separately moved to transfer this matter to the issuing court, where Judge Debra Freeman has held or issued nearly a dozen conferences and orders on discovery.

[3]    *See* ECF 127, ¶¶ 7, 11, 15, 60, 79, 80-82, 84-85.

the close of discovery because Mr. Bannon failed to appear as subpoenaed on the date within discovery and then disingenuously objected to it reopening.

In this, the compliance Court, Movant has had to overcome other hurdles—of misinformation from Mr. Bannon concerning the events following service of the subpoena on November 14, 2019.

### A. The Subpoena Compliance Date Was Never Extended

First, Mr. Bannon contends "there is no dispute that [Movant] adjourned Mr. Bannon's original compliance date of November 22, 2019[] to December 5, 2019—a date outside the fact discovery window." (ECF 8, p. 14)[4] Not only is this untrue but it makes no final point—Mr. Bannon did not seek or obtain relief by December 5th. He still has not moved for relief.

That there was no agreement to extend the subpoena return date from November 22nd to December 5th is evidenced by the record of non-appearance that a certified court reporter made on November 22, 2019 when Mr. Bannon failed to appear for the deposition. (Ex. A) It is also evidenced by the uncertainty in Mr. Bannon's own communication about December 5th (Ex. B). There, his counsel merely references a "potential" deposition on December 5th that could not be confirmed until counsel "better understood the nature [and] scope of your subpoena" because, according to Mr. Bannon, Movant still had not provided a "clear articulation" for the need of the deposition in the first instance. Mr. Bannon's counsel wrote, "[o]nce we have that information, we will be in a better position to determine the appropriateness of a deposition on December 5." (Ex. B) After sending this message, Mr. Bannon's counsel wrote on December 2nd that a court order was required for any deposition "to be taken after November 29th."

---

[4]      And ECF 8, p. 4, "On November 21, 2019, [Movant] agreed to adjourn Mr. Bannon's deposition until December 5, 2019."

3

Mr. Bannon should not be allowed to use an exploratory discussion to after-the-fact raise the window under Rule 45(d)(3), a window controlled only by this Court. Even if the parties had reached agreement to extend the return date to December 5th (and they decidedly had not), Mr. Bannon never sought relief from this Court to extend the return date under Rule 45, and the objection window closed November 22, 2019 when he did not appear at the deposition.

### B. A Motion to Quash From Mr. Bannon was Due Prior to November 22, 2019

Second, Mr. Bannon mischaracterizes the content of the December 13th conference with the issuing court. At no point did Mr. Bannon ask (or receive) permission from the issuing court to belatedly file a motion to quash under Rule 45(d)(3). Such a request is not in either the hearing transcript (Ex. C) or Mr. Bannon's pre-conference submission (Ex. D). In fact, Movant expressly argued in its own submissions (Ex. E) that Mr. Bannon already was too late to seek relief. But because the issuing court understood that this Court was the compliance court and no transfer order had been entered (or even requested) by the time of the conference, the issuing court necessarily limited its ruling to overruling Mr. Bannon's objection and reopening discovery to allow his deposition by January 10th.

### C. Mr. Bannon Has Sought No Relief from this Court

Third, although Mr. Bannon asks the Court to deny Movant's Motion to Compel, he does so from a jeopardized position. Mr. Bannon cannot avoid the preclusive effect of his failure to take action by disingenuously arguing that Movant's Motion to Compel preempted him from filing a "duplicative motion" of his own. (ECF 8, p. 15) The Motion to Compel was filed because Mr. Bannon would not take action, leaving it up to Movant to ensure a decision by the compliance court within sufficient time to meet the issuing court's January 10th deadline,[5] a

---

[5] Mr. Bannon argues his deposition is sought "after the close of fact discovery" (ECF 8, p. 2), but the issuing court specifically allowed Mr. Bannon's deposition to occur on January 10th after finding that

deadline Mr. Bannon did not object to during the December 13th conference or seek reconsideration of but later tried to undermine.[6] Mr. Bannon repeatedly informed the issuing court and Movant that a motion to quash the subpoena would be filed (Ex. D, p. 1) but none ever was—in an effort to draw out the briefing schedule to make the January 10th court deadline, to use Mr. Bannon's own words, "meaningless": "[w]e agree to a placeholder deposition date of January 10.  As we have stated, however, we plan to file a motion to quash.  We will file that motion before the January 10 placeholder date.  *At that point, the January 10 date becomes meaningless as Mr. Bannon would not be required to appear for the deposition.*" (Ex. F, emphasis added)[7]

### D. No Other Fact Witness Has Testified to Mr. Bannon's Knowledge

Finally, Mr. Bannon argues that Movant intends "to ask the very same questions it has already asked [] Guo [Wengui] over the course of his deposition."  (ECF 8, p. 2)  Mr. Bannon cannot, of course, know in advance the individual questions that Movant intends to ask him, although Movant gave a comprehensive overview of the expected subjects of testimony at pp. 7-10 of its Motion to Compel (ECF 1-1)  That overview specifically detailed events exclusive to Mr. Bannon and not directly involving Guo, including Mr. Bannon's personal attempt to intimidate J. Michael Waller, one of Movant's witnesses, about his testimony in this case.  Further, the full extent of Guo's testimony is not before the Court, and it is unfair for Mr. Bannon to ask the Court to take his word that Mr. Guo provided fulsome testimony when the

---

Strategic Vision was diligent to obtain the testimony prior to discovery closing.  The only timeliness problem here is that suffered by Mr. Bannon from his decision to ignore the November 22, 2019 subpoena return date.

[6] Only after repeated attempts to obtain a date within the deadline (including three telephone calls arranged for and then cancelled by Mr. Bannon's counsel) did Mr. Bannon's counsel finally agree on December 18th to a "placeholder" of January 10th.

[7] It now seems clear that Mr. Bannon's discussions with counsel in the week of his originally-noticed deposition date (November 22nd) also were a ruse—nothing more than an effort to delay past the November 29th discovery deadline and avoid a pre-deadline appearance before the issuing Court.

issuing court has held no less than three conferences about Guo's refusals to appear and failure to answer deposition questions. For Mr. Bannon to point to Guo as the solution to Mr. Bannon's subpoena is wholly misguided. It serves as another reason why the Court should transfer this matter to the issuing court rather than have to wade into the tortured history of Guo Wengui's discovery behavior in this case.

In sum, when Mr. Bannon's various misrepresentations have been corrected, they no longer offer a distraction from his fundamental procedural problem—he has waited too long to raise either of the "two fatal flaws" he claims makes the subpoena unenforceable (i.e. the APEX doctrine and relevance, ECF 8, p. 2). He thus cannot rely on cases where the burden as to the discoverability of the testimony must be proven by the party seeking it because the deponent has objected to relevancy.  (ECF 8, p. 14, *citing Meijer, Inc. v. Warner Chilcott Holdings Co., III*, 245 F.R.D. 26, 30, (D.D. C. 2007) ("Once a relevancy objection has been raised…").  The Court should enforce the subpoena and enter relief that includes, without limitation, an order for Mr. Bannon to appear as noticed on January 10, 2019 pursuant to Fed. R. Civ. P. 37(a)(2), (a)(3)(B)(i) and (b)(1) and Fed. R. Civ. P. 45(g).

## **ARGUMENT**

### A. **The Apex Doctrine Provides No Reason to Limit Bannon's Deposition**

Mr. Bannon, who was dismissed from White House service in August 2017, should receive no protection from the apex doctrine. Mr. Bannon simply misunderstands the scope and relevance of his testimony. It will involve his work on behalf of Guo, not his reasons for taking official action. Indeed, Mr. Bannon noticeably holds back from asserting that he took *any* official action or exercised any official discretion involving Guo—a topic on which Mr. Bannon has been silent in repeated court filings, despite the fact that it was initially his burden to show that

the doctrine would apply. *See Byrd v. District of Columbia*, 259 F.R.D. 1, 7 (D. D.C. 2009) (holding that the party advocating for application of the apex doctrine is "subject to deposition" unless it meets its burden to "show that the need for the protective order is sufficient to overcome plaintiffs' legitimate and important interests in trial preparation"; if it does, the burden then shifts to the "party seeking the deposition" to show that the "information cannot be obtained elsewhere.") (internal quotes and citations omitted).

Crucially, Mr. Bannon's most important work occurred after he left government service: his then-secret side trip to China for an off-the-books meeting with Guo's supposed arch-nemesis and President Xi Jinping's second-in-command, Wang Qishan, just weeks after Guo had written to Xi and senior CCP leadership asking for "instructions" on his activities in the United States. Mr. Bannon's other work on behalf of Guo's U.S. influence campaign—including his acceptance of access to confidential files in this case and his use of those materials to convey threats against a key Strategic Vision witness—are even later in time, and have nothing to do with any official action by Mr. Bannon. Thus, the apex doctrine can hardly justify quashing—or even limiting the scope of—Mr. Bannon's deposition.

1. **The Apex Doctrine Does Not Apply Here**

"[T]he complete prohibition of a deposition is an extraordinary measure which should be resorted to only on rare occasions." *Zimmerman v. Al Jazeera America LLC*, 329 F.R.D. 1, 5 (D. D.C. 2018) (applying "corporate" version of doctrine to high-ranking Al Jazeera official and deciding that he should be deposed). Crucially, as Mr. Bannon himself admits (ECF 8, p.11), the doctrine only prohibits certain types of testimony by top executive department officials: they "should not, absent extraordinary circumstances, be called to testify *regarding their reasons for taking official actions*." *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C.

7

Cir. 1985) (emphasis added) (citing the doctrine in approving ALJ's refusal to allow a party to call as witnesses "top Department of Labor officials," and citing other courts that "refused to allow examination of top Government officials regarding decisions committed to their discretion.").

Here, as Strategic Vision's Motion (ECF 1-1, p. 4-5) makes clear, the key elements of Mr. Bannon's testimony will be (1) contacts by Guo and his network with Chinese officials in the fall of 2017 (when Mr. Bannon traveled to Beijing, after leaving the White House, and leading up to the January 4, 2018 news report that Bannon had started working for Guo); (2) Guo's U.S. litigation and publicity campaign in 2017-2019 and its effect on Chinese dissidents and China hawks in the U.S.; and (3) the source of payments used to fund Guo's operation (including payments to Mr. Bannon, which he tellingly does not deny) from overseas. *Id*. None of this relates to Mr. Bannon's tenure in the White House. None of it relates to official actions of any kind. None of it relates to Mr. Bannon's *reasons* for taking official action of any kind. Again, Mr. Bannon knew all of this before delaying his deposition; objecting to it (later); and filing his recent Opposition.

To be sure, some portion of Strategic Vision's questioning will necessarily explore the issue of how and when Mr. Bannon first became aware of Mr. Guo and first began to support him—including Bannon's first contacts with Guo, and including through intermediaries. This question is essential, in turn, to countering claims by Guo's network that Bannon could not have discussed Guo with Wang Qishan in September 2017, because Guo and Bannon purportedly first "met" in person in early October 2017.

So what was Bannon's involvement with Guo before he met with Guo's arch-nemesis, Wang Qishan, in Beijing? As Strategic explained in its Motion to Compel, based on Bannon's

8

own public statements, it appears that Bannon's knowledge of Guo's situation first occurred in the White House.[8] There, however, the record goes cold. No witness in this case knows (or could know) what happened. Indeed, there is no evidence that any official action, let alone administrative proceeding, occurred; Mr. Bannon merely told the New York Times on the record that he "sided with those in the administration who opposed any handover [of Guo to the Chinese], viewing Mr. Guo as a potentially valuable 'intelligence asset'". *Id*. To support his Opposition, Mr. Bannon could have gone a step further, claiming that there was indeed an administrative proceeding, and further, that he played a decision-making role. Tellingly, he remained silent. Thus, to the extent that questioning Mr. Bannon about his initial involvement with Mr. Guo (or his intermediaries) merely touches on White House "discussions" (as Strategic Vision actually alleged, ECF 8, Ex. B, ¶79), and not on discretionary decisions by the Executive Branch or "reasons for taking their actions," *Simplex*, 766 F.2d at 586, the doctrine cannot apply at all. Again, it is only inquiry into "reasons for taking" administrative action that actually implicates the apex doctrine.

Further, to the extent that questions focus on Guo's (or his intermediaries') courting of Bannon during the time he was in the White House, those Guo-Bannon contacts are not official actions at all—let alone the type of internal administrative deliberations that would be protected under the apex doctrine. In the alternative, if Bannon is arguing that Guo or his intermediaries lobbied[9] him to take official action, then those contacts should be disclosed (both in this case and through required federal filings) and can certainly not be protected under the apex doctrine.

In short, the apex doctrine cannot apply to the meat of the questioning of Bannon regarding his post-White House work on behalf of Guo and his payment by Guo. With respect to

---

[8] *See* https://www.nytimes.com/2018/12/04/business/stephen-bannon-guo-wengui-china.html.
[9] Some source, perhaps Bannon, told the New York Times that the White House was "lobbied" regarding the possible extradition of Guo to China. *Id*.

Bannon's White House time, Bannon makes no allegation, let alone showing, that he was engaged in official action regarding Guo. The doctrine cannot apply.

### 2. Even if the Doctrine Applies to the Period Before Mr. Bannon's White House Departure in August 2017, its Elements Are Met

Where it applies, the apex doctrine "only forecloses the deposition of officials who lack relevant knowledge that cannot be obtained from other witnesses." *Zimmerman*, 329 F.R.D. at 7. "Courts have time and again allowed the deposition of current and former high-ranking government officials upon a showing that the official has personal involvement or knowledge relevant to the case." *U.S. v. Sensient Colors, Inc.*, 649 F.Supp.2d 309, 322 (D. N.J. 2009).

Although some courts in this district have assumed that the doctrine applies to attempts to elicit such testimony from "former government officials," courts also hold that an official's grounds for objection in that case are narrower due to the different interests in play. *See Moriah v. Bank of China Ltd.*, 72 F.Supp.3d 437, 440 (S.D.N.Y. 2014) ("Although the doctrine applies to former officials, the fact that they are not current high-ranking officials is a factor when considering whether the information can be obtained through less burdensome means and whether the deposition will interfere with the official's duties."); *Sensient,* 649 F.Supp.2d at 326-327 (observing that the analysis of the apex doctrine with respect to a former government official is different than with a sitting official, since it necessarily "will not interfere with her duties," and that sitting for a deposition is "no more burdensome than it would be for any other private citizen."); *FDIC v. Galan-Alvarez*, 2015 WL 5602342, (D.D.C. Sept. 4, 2015) (relying on *Sensient* for proposition that doctrine applies to former officials, but noting that they only remaining policy reasons are (1) protecting the administrative process and (2) avoiding "disincentivizing" public service); *Byrd*, 259 F.R.D. at 8 (observing that when considering

potential disruptions of a deposition, it is the "current position, not any former position, that is evaluated.").

As noted above, the apex doctrine should not apply, but if it does, it could only conceivably cover the period before mid-August 2017 (and the reasons for official actions at that time), before Mr. Bannon was dismissed from the White House. For that period, as explained above, questioning will narrowly focus on how Mr. Bannon learned of Guo's situation and whether he had any dealings with Guo, whether directly or through intermediaries. Assuming what Mr. Bannon told the New York Times is true (and in the absence of a denial in any of Mr. Bannon's filings or communications on this matter), he *does* have personal knowledge of these facts. Regardless of whether Mr. Guo has his own knowledge of whether he sought out Mr. Bannon, it is Mr. Bannon alone who actually would have received information or contacts emanating from Guo. Thus, Strategic Vision could never rely entirely on Guo, and the testimony of Bannon—the recipient—is essentially.

Further, the factor calling for exhaustion of other sources of information has questionable relevance for depositions of former public officials, since sitting for a deposition is "no less burdensome than it would be for any other private citizen." *Sensient*, 649 F.Supp.2d at 326-327. Additionally, any concern with disincentivizing individuals from public service would not seem to apply here, as Mr. Bannon's willingness to speak on and off the record regarding his dealings with Guo's situation during the period he served in the White House (whether such dealings were official or not) shows that the limelight of public disclosure is, if anything, a reward rather than a burden for Mr. Bannon.[10] If Mr. Bannon was in fact familiar with Mr. Guo or in contact

---

[10] Mr. Bannon cites one case from this jurisdiction which he claims holds that an official's making of public statements is irrelevant to his later assertion of the apex doctrine. *See* Opposition, ECF 8, p. 7, fn. 1 (citing *Kelley v. Fed. Bureau of Inv.*, 2015 WL 13648073 at *3 (D.D.C. July 16, 2015). But Mr. Bannon truncates a quote from the case in a way that misstates its holding, suggesting that an official's

11

with him before Mr. Bannon secretly met in Beijing for three hours with Mr. Guo's (allegedly) chief CCP enemy, just after Mr. Guo had asked senior CCP leadership for instructions, Strategic Vision should be able to find out.

### B. Bannon's Challenges to Relevancy Fail

Mr. Bannon's relevancy objections should be kept in practical context—he never denies he has answers to the questions Movant would pose, laid out in considerable detail in the Motion to Compel (ECF 1-1, pp. 7-10, "Anticipated Areas of Testimony from Mr. Bannon"). Further, Mr. Bannon cannot in good faith hold himself out to be an expert on the factual support and legal merit of the case. He is a non-party and, given his close personal, professional, and financial ties to Guo Wengui, is biased in favor of construing the facts favorably to Eastern Profit, one of Guo's companies and the plaintiff herein. For example, Mr. Bannon alleges that Eastern Profit paid Movant $1 million under the Research Agreement at issue. The record evidence does not bear this out—another entity (ACA Capital Group Limited) paid the $1 million in two separate wire transfers to Movant. This is critical because it defeats Eastern Profit's breach of contract, fraud, and unjust enrichment claims, where damages or a "benefit" cannot be shown by Eastern Profit.

At another point, Mr. Bannon claims that Strategic Vision will lose on summary judgment because its deponents supposedly "admit[ed] that it did not rely on representations about Guo's dissident status when entering into the Contract." ECF 8, p.11. No one can tell

---

willingness to talk to the press cannot allow courts to apply "the presumption against deposing a high-ranking public officials" [sic] "with any less force." This is incorrect. The case merely held that sitting cabinet secretary Jeh Johnson's "on the record" remarks to a newspaper did not make it more likely that he was the "source of previous unauthorized and unattributed leaks." *Id*. (The existence of a leaker was a factual issue in that case.) *Id*. Here, Strategic's argument is not that Mr. Bannon's talks to the press mean he is a leaker. Instead, they mean that, as a former official, he cannot be heard to claim that having to answer questions under oath about a given topic would have disincentivized him from accepting public service, when he freely comments on those same topics (both on and off the record) to the news media.

where Mr. Bannon obtained this surprising—and untrue—nugget. It lacks any citation, perhaps because no such evidence exists. Elsewhere, even though Mr. Bannon has previously been able to access Strategic Vision's deposition transcripts, Mr. Bannon now chooses to content himself with citing Eastern Profit's letters that, in turn, try to argue facts in the issuing Court (a required precursor to the parties' cross-motions on summary judgment). *See* ECF 8, p.11. But those letters—which, crafted by Bannon's ally, Eastern, already inaccurately summarize the facts—are apparently stretched even further from reality once in Mr. Bannon's hands. *See, e.g., id.* ("…having admittedly done **nothing** to verify Mr. Guo's dissident status prior to executing the contract…") (emphasis in original). This Court does not have the full case before it and has not handled similar objections from Mr. Bannon's allies within Guo's network, but if it keeps this Motion, it should handle with caution Mr. Bannon's relevancy contention that there is only a "tenuous" connection between his anticipated testimony and the underlying case, such that his deposition would be "plainly irrelevant to the Underlying Action." (ECF 8, pp. 2, 4)

Mr. Bannon's mistaken understanding of who made the contract payment to Movant also casts severe doubt on the accuracy of his relevancy statements about Movant's fraud claim. The fact that ACA, not Eastern Profit, paid Movant Strategic Vision is critical. Eastern Profit claims its assets have been frozen in Hong Kong due to the Mainland's crackdown on Guo and related dissidents. But ACA, too, is based in Hong Kong and is openly and publicly associated with both Guo and a man named William Je, who on paper controls ACA. If Guo and his network have truly run afoul of the Mainland, how can ACA have financed the underlying Contract at issue, as well as Guo's other dealings in the U.S.? Guo's network claims that Je is also a dissident, but that is unlikely: Je has extensive Mainland contacts (including service on the Chinese People's Political Consultative Conference, his economic advice to Mainland cities, and his membership

13

in a Mainland-Hong Kong "patriotic" group of the type that the CCP uses to project its influence into Hong Kong. Je, who Guo introduces as his "money guy," has had substantial contact with Bannon and, just as he has made payments to Movant from ACA on behalf of Guo or other entities in his network, may well have paid Bannon for his work for Guo.

More broadly, in repeatedly asserting this is a "breach of contract action" (ECF 8, p. 1), Mr. Bannon tries to dismiss the significance of the other claims in the case, which include fraudulent misrepresentation (by both parties) and unjust enrichment and for declaratory judgment (by Eastern Profit). Strategic Vision's fraud claim, again, asserts that Guo misrepresented his status as a dissident. The issuing court has allowed Strategic Vision to discover information about Guo's communications with the Chinese leadership in the months before he represented to Strategic Vision that he was a dissident. Mr. Bannon is expected to have information on Guo's contacts with Chinese officials in the fall of 2017 (when Mr. Bannon traveled to Beijing in an unofficial capacity because he was no longer a member of the administration).

## C. Bannon's Testimony is Relevant and Proportional to this Case

Proportionality is "conjoined" to relevance because it weighs relevance with the burden on non-parties. *See Pearlstein v. BlackBerry Ltd.*, 2019 WL 5287931 at *3 (S.D.N.Y., Sept. 20, 2019) (where court approved 32 topics for foreign witness, one additional topic was denied as disproportionate because it dealt with a phone model not being litigated, there was no showing the witness would have knowledge, and the burden on the nonparty to testify without personal knowledge would be great). Mr. Bannon's testimony is relevant, and the burden on him is not substantial. He is not being asked to produce documents and the deposition is expected to last no more than half a day. Mr. Bannon will be deposed in Washington, D.C., near where he lives.

14

The inquiry will be limited to his interactions with Guo, or with others on Guo's behalf, as they pertain to the truth or falsity of Guo's claim to Movant that he was a dissident. Only Mr. Bannon has this information.

## CONCLUSION

Movant seeks the relief described above and, as allowed under Rule 37, its reasonable legal fees and expenses to bring this matter before the Court.

Dated January 3, 2020

                                              Respectfully submitted,

                                              GRAVES GARRETT LLC

                                              */s/ Edward D. Greim*
                                        Edward D. Greim, D.D.C. Bar #MO008
                                        Lucinda H. Luetkemeyer (*pro hac vice*)
                                        1100 Main Street, Suite 2700
                                        Kansas City, MO 64105
                                        Telephone: (816) 256-3181
                                        Fax: (816) 256-5958
                                        edgreim@gravesgarrett.com
                                        lluetkemeyer@gravesgarrett.com
                                        ATTORNEYS FOR MOVANT AND
                                        DEFENDANT/COUNTERCLAIM PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2020, the foregoing was served via electronic mail to all counsel of record, including:

William A. Burck
Allison L McGuire
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, DC 20001
202-538-8272
allisonmcguire@quinnemanuel.com

                                      */s/ Edward D. Greim*
                                      Attorney for Movant